IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in May 7, 2019

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.  18-cr-255 (PLF) |
| | : | |
| v. | : | VIOLATIONS: |
| | : | |
| AHMADREZA MOHAMMADI | : | 18 U.S.C. § 371 |
| DOOSTDAR and | : | (Conspiracy) |
| | : | |
| MAJID GHORBANI, | : | 18 U.S.C. § 951 |
| | : | (Acting as an Unregistered Agent of |
| | : | a Foreign Government) |
| Defendants. | : | |
| | : | 50 U.S.C. §§ 1701-1706 |
| | : | (International Emergency Economic |
| | : | Powers Act) |
| | : | |
| | : | 31 C.F.R. Part 560 |
| | : | (Iranian Transactions and Sanctions |
| | : | Regulations) |
| | : | |
| | : | 18 U.S.C. § 2 |
| | : | (Aiding and Abetting) |

## INDICTMENT

The Grand Jury charges that:

## COUNT ONE

At all times material to this Indictment:

1.      Defendant Ahmadreza Mohammadi DOOSTDAR (DOOSTDAR) was born in Long Beach, California, in or around 1980; DOOSTDAR is a United States Citizen. DOOSTDAR left the United States in 1982 and moved to Canada and then to Tehran, Iran. DOOSTDAR has resided outside of the United States continuously since 1982, and prior to in or around 2017, DOOSTDAR had only visited the United States briefly on two occasions.

2.      Defendant Majid GHORBANI (GHORBANI) was born in or around 1959, and was raised in Iran. He first entered the United States in 1995. On or about May 28, 2015, GHORBANI became a Legal Permanent Resident of the United States. GHORBANI also uses the alias "HAMID."  He has lived and worked in Costa Mesa, California, since he arrived in the United States.

3.      Coconspirator A is citizen of Iran, and resided there continuously during all times relevant to this conspiracy.

4.      The Government of Iran is a foreign power with which the United States has no formal diplomatic relations. The U.S. Secretary of State has designated Iran a state sponsor of terrorism each year since 1984; Iran is one of only three foreign countries to be so designated.

5.      The People's Mujahedin of Iran, or Mojahedin-e Khalq (MEK), was created by a group of individuals who opposed the 1979 Iranian Revolution. Those individuals were exiled from Iran after the revolution, and they have continuously advocated for the overthrow of the current regime since that time. The National Council of Resistance of Iran (NCRI) was created in 1981 to act as a political front for the MEK.  The Government of Iran considers the MEK to be a primary opponent of the current regime and has sought to eradicate the MEK.

6.      The Government of Iran does not recognize Israel as a sovereign nation; it considers Israel to be oppressing the people of Palestine.

7.      Hillel Houses and Chabad centers are examples of Jewish Centers within the United States.  These entities publicly support Israel and the Israeli people.

8.      DOOSTDAR, GHORBANI, and Coconspirator A did not, at any time, notify the Attorney General, whose office in the Department of Justice is located in the District of

Columbia, that DOOSTDAR and GHORBANI would and did act in the United States as an agent of a foreign government.

## The United States Sanctions Against Iran

9.      The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1706, authorizes the President of the United States to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States, when the President declares a national emergency with respect to that threat.

10.     On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." Executive Order No. 12957, as expanded and continued by Executive Orders Nos. 12959 and 13059, was in effect at all times relevant to this Indictment.

11.     Executive Orders Nos. 12959 and 13059 (collectively, with Executive Order No. 12957, "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited, among other things, the exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

12.     The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the

promulgation of rules and regulation, as may be necessary to carry out the purposes" of the

Executive Orders.  Pursuant to this authority, the Secretary of the Treasury, through the Office of

Foreign Assets Control (OFAC), promulgated the Iranian Transactions and Sanctions

Regulations (ITSR), 31 C.F.R. Part 560, implementing the sanctions required by the Executive

Orders.

13.     Specifically, absent permission from OFAC in the form of a license, the ITSR

prohibited the supply, directly or indirectly, from the United States, or by a United States person,

wherever  located, of any services to Iran or the Government of Iran (31 C.F.R.  Part  560.204).

14.     "United States Person" was defined to include United States citizens, or

permanent resident aliens, or individuals located within the United States.

15.     The ITSR were in effect at all times relevant to this Indictment.

16.     DOOSTDAR, GHORBANI, and Coconspirator A did not, at any time, apply for a

license from OFAC, which is located in the District of Columbia, to export services to Iran.

### The Conspiracy

17.     From in or around March 2017, up to and including August 9, 2018, in the

District of Columbia, Iran, and elsewhere, DOOSTDAR, GHORBANI, Coconspirator A, and

other unindicted coconspirators, whose identities are known and unknown to the grand jury, did

knowingly and unlawfully combine, confederate, and agree together, with each other, and with

other persons, both known and unknown to the Grand Jury, to commit offenses against the

United States, to wit, Title 18, United States Code, Section 951, and Title 50, United States

Code, Sections 1701 et seq.

## Objects of the Conspiracy

18.     It was a part of the conspiracy and the objects of the conspiracy that

DOOSTDAR, GHORBANI, and Coconspirator A knowingly did act as agents of a foreign

government, specifically the Government of Iran, and that DOOSTDAR and GHORBANI did so

within the United States without prior notification to the Attorney General, as required by law, in

violation of Title 18, United States Code, Section 951, and did provide services to Iran, without

having first obtained the required license from OFAC, as required by law, in violation of Title

50, United States Code, Sections 1701 et seq.

## Manner and Means of the Conspiracy

19.     Beginning as early as March 2017, the Government of Iran would direct

DOOSTDAR to travel to the United States in order to collect intelligence information about

entities and religious organizations that the Government of Iran considers to be opponents of

their regime, including the MEK and identified Jewish organizations in the United States.

20.     Once in the United States, in July 2017, DOOSTDAR would recruit GHORBANI

to act as an agent of the Government of Iran and would direct him to collect intelligence

information about the entities listed above.

21.     While DOOSTDAR was in the United States, Coconspirator A would act as his

intermediary, in order to facilitate communications between DOOSTDAR and his Government

of Iran hander (the "GOI handler"), who was directing DOOSTDAR's activity in the United

States from Iran.

22.     DOOSTDAR and GHORBANI would conduct surveillance on these entities

within the United States.

23.     DOOSTDAR and GHORBANI, working independently and together, would package and provide this information to the Government of Iran.

## **Overt Acts**

24.     In furtherance of the conspiracy and to effect the objects thereof, defendants DOOSTDAR, GHORBANI, Coconspirator A, and other unindicted coconspirators, whose identities are known and unknown to the grand jury, did commit the following overt acts, in the District of Columbia, and elsewhere:

a.     Beginning in or around March 2017, from Iran, DOOSTDAR conducted online research in order to plan a trip to Costa Mesa, California.

b.     On or about July 19, 2017, DOOSTDAR travelled from Tehran, Iran, to Chicago, Illinois.

c.     On or about July 19, 2017, in response to questions by U.S. Customs and Border Protection (CBP), DOOSTDAR stated he was visiting his brother in Chicago, Illinois, until approximately July 30, 2017, and he falsely stated that he intended to travel to Los Angeles, California, to visit his brother's in-laws.  DOOSTDAR noted he intended to visit the Long Beach area where he was born.

d.     On or about July 19, 2017, Coconspirator A informed DOOSTDAR's GOI handler that DOOSTDAR had arrived safely but that he had been searched at the border. In a later communication, on or about July 23, 2017, using coded language, Coconspirator A informed the GOI handler that DOOSTDAR had been a "guest of friends for 2 to 3 hours" when he arrived in the United States.  The GOI handler reassured DOOSTDAR, through Coconspirator A, that there was no need to worry about the matter.

e.      On or about July 21, 2017, DOOSTDAR conducted physical surveillance of the Rohr Chabad Center, a Jewish center on the University of Chicago campus. DOOSTDAR photographed the front and back of the Rohr Chabad Center, as well as the wrought iron fence surrounding the building.

f.      On or about July 25, 2017, DOOSTDAR traveled from Chicago, Illinois, to Costa Mesa, California.

g.      On or about July 26, 2017, Coconspirator A informed the GOI handler that DOOSTDAR had arrived in Costa Mesa, California.  The GOI handler communicated back that Coconspirator A should tell DOOSTDAR to be alert during any contact with the "friends."

h.      On or about July 26, 2017, DOOSTDAR met with GHORBANI at a Persian restaurant in Costa Mesa, California.

i.      On or about July 26, 2017, after leaving the meeting, DOOSTDAR conducted counter-surveillance by walking approximately one mile to a gas station in the opposite direction of his ultimate destination.

j.      Thereafter, on or about July 26, 2017, Coconspirator A communicated with the GOI handler, using coded language, to clarify on behalf of DOOSTDAR whether GHORBANI was also known as "Hamid."

k.      On or about July 27, 2017, Coconspirator A, using coded language, communicated instructions to DOOSTDAR from the GOI handler about how to approach GHORBANI, advising DOOSTDAR to use his people skills to befriend GHORBANI. During these communications, Coconspirator A and the GOI handler referred to DOOSTDAR as "Amir." On that same day, the GOI handler, using coded language,

directed DOOSTDAR, through Coconspirator A, to pay GHORBANI either $3,000 or $5,000, and to not take his cell phone to the meeting.

l.      On or about July 27, 2017, DOOSTDAR returned to the gas station, where GHORBANI picked him up in an automobile.

m.      On or about July 27, 2017, DOOSTDAR and GHORBANI met for approximately one hour in Costa Mesa, California.

n.      On or about July 27, 2017, GHORBANI drove DOOSTDAR back to the rental apartment where DOOSTDAR was staying in Costa Mesa, California.

o.      Thereafter, on or about July 28, 2017, Coconspirator A, using coded language, communicated to the GOI handler that DOOSTDAR had paid GHORBANI, and that GHORBANI should be referred to as "Uncle Sohrab."

p.      On or about July 29, 2017, GHORBANI picked DOOSTDAR up at his rental apartment.

q.      On or about July 29, 2017, GHORBANI and DOOSTDAR met again for approximately one hour in Costa Mesa, California.

r.      On or about July 29, 2017, GHORBANI drove DOOSTDAR back to DOOSTDAR's rental apartment and handed DOOSTDAR a shopping bag from a department store.

s.      On or about July 29, 2017, Coconspirator A told the GOI handler that DOOSTDAR had reported that GHORBANI was very excited about the new plan, and that GHORBANI was planning to visit Iran during the Eid holiday and would bring a lot of things with him.

t.      On or about July 30, 2017, DOOSTDAR departed the United States to return to Iran.

u.      On or about September 19, 2017, from Iran, DOOSTDAR reserved a rental apartment in Costa Mesa, California, for December 9-13, 2017. DOOSTDAR also reserved airline tickets from Tehran, Iran, to Chicago, Illinois, arriving on December 5, 2017; from Chicago, Illinois, to Los Angeles, California, arriving on December 9, 2017; and from Los Angeles, California, to Tehran, Iran, departing on December 13, 2017.

v.      On or about September 20, 2017, at the direction of DOOSTDAR, GHORBANI attended a rally, conducted by the MEK/NCRI in New York, New York, at which the Iranian regime was criticized.

w.      On or about September 20, 2017, during this rally, GHORBANI conducted physical surveillance and photographed individuals participating in the rally.

x.      On or about December 4-5, 2017, DOOSTDAR traveled from Iran to O'Hare International Airport in Chicago, Illinois.

y.      On or about December 5, 2017, DOOSTDAR had in his possession $6,000 cash, a notebook, and two flash drives, one of which was concealed in a toy on a key chain.

z.      On or about December 5, 2017, when interviewed by CBP at O'Hare International Airport, DOOSTDAR falsely reported that he did not visit any friends, family, or contacts in California in July 2017. He further falsely reported that he did not have any friends, family, or contacts in California whom he was planning to visit on the December 2017 trip.

aa.     On or about December 9, 2017, DOOSTDAR traveled from Chicago, Illinois, to Costa Mesa, California.

bb.     On or about December 10, 2017, DOOSTDAR called GHORBANI from a payphone in Costa Mesa, California, and identified himself as "Amir Mohajir." When GHORBANI said that he did not know who was calling, DOOSTDAR then exclaimed, "you are Uncle Sohrab!" The two men agreed to meet at approximately 1:00 p.m., near the rental apartment location where DOOSTDAR stayed in July 2017.

cc.     On or about December 10, 2017, GHORBANI picked DOOSTDAR up at the agreed location.

dd.     On or about December 10, 2017, in the car, GHORBANI reported to DOOSTDAR that he had taken photographs and collected information from the September 20, 2017 MEK rally.

ee.     In response, on or about December 10, 2017, DOOSTDAR provided GHORBANI with a flash drive to copy the information onto, instructing him to save his information in a scattered format. GHORBANI replied that he just had "10-12 photos," and DOOSTDAR said that was good, and to just "explain what those are."

ff.     On or about December 10, 2017, GHORBANI informed DOOSTDAR that GHORBANI would be traveling to Iran in March 2018 where he would provide an in-person briefing about the people involved with the September 20, 2017 MEK rally.

gg.     On or about December 10, 2017, DOOSTDAR confirmed that certain individuals would be available to meet with GHORBANI in Iran.

hh.     On or about December 10, 2017, GHORBANI printed photographs at a pharmacy that were placed within an orange and white photograph envelope. GHORBANI

also copied the photographs onto the flash drive that had been concealed in a toy on a key chain that was in DOOSTDAR's possession when he entered the United States.

  ii. On or about December 11, 2017, GHORBANI and DOOSTDAR met outside of a coffee shop in Costa Mesa, California, for approximately 45 minutes.

  jj. During this meeting, on or about December 11, 2017, DOOSTDAR took notes and left carrying the orange and white photograph envelope and the key chain containing the flash drive.

  kk. On or about December 12, 2017, while DOOSTDAR was awaiting his outbound fight at Los Angeles International Airport, DOOSTDAR carried within his hand-carry luggage a signed, hand-written payment receipt stating, "I, Uncle Sohrab, received $2,000."

  ll. On or about December 12, 2017, as DOOSTDAR was awaiting his outbound fight at Los Angeles International Airport, DOOSTDAR transported within his checked luggage the orange and white photo envelope, which was concealed in a pair of boxer shorts. That envelope contained 28 photographs from the September 20, 2017 MEK rally. Many of the photographs contained hand-written notes on the back, which listed the identities and positions of the individuals depicted in the photographs.

  mm. On or about March 14, 2018, the FBI conducted a covert search of GHORBANI's apartment and discovered a suitcase containing a manila envelope containing biographical and personal identifying information about several U.S. Congressmen with overt ties to the MEK. The FBI left these materials in place.

nn.     On or about March 27, 2018, GHORBANI traveled to Iran, carrying the same suitcase.

oo.     On or about April 17, 2018, GORBHANI returned to the United States. At the time of his return, he had in his possession handwritten notes containing DOOSTDAR's Iran-based mobile number and directions to collect additional intelligence on individuals associated with the MEK.

pp.     On or about May 4, 2018, at DOOSTDAR's direction, GHORBANI traveled from Los Angeles, California, to Washington, D.C., to attend an MEK conference at which the Iranian regime was criticized.

qq.     On or about May 4, 2018, GHORBANI attended the MEK-sponsored 2018 Iran Freedom Convention for Human Rights at the Grand Hyatt Hotel in Washington, D.C., where he filmed and/or photographed conference speakers and attendees.

rr.     On or about May 6, 2018, GHORBANI returned to California.

ss.     On or about May 14, 2018, DOOSTDAR called GHORBANI to discuss the methods GHORBANI should use to provide the intelligence information he had collected at the MEK conference in Washington, D.C., to DOOSTDAR in Iran.

tt.     On or about July 19, 2018, DOOSTDAR traveled from Tehran, Iran, to Chicago, Illinois.

uu.     On or about July 19, 2018, DOOSTDAR entered the United States carrying $16,000 in cash.

vv.     On or about July 27, 2018, DOOSTDAR made three attempts to call GHORBANI from a payphone in Chicago, Illinois.

ww.     On or about July 25, 2018, Doostdar passed a message to Coconspirator A that he was thinking about finding a place in Chicago for a month and then going to see their "friend" in California.

xx.     Prior to August 9, 2018, DOOSTDAR purchased a ticket to travel from Chicago, Illinois, to Costa Mesa, California, on August 20, 2018.

yy.     At no time from in or around March 2017 through on or about August 9, 2018, did DOOSTDAR or GHORBANI notify the Attorney General, whose office at the Department of Justice is located in the District of Columbia, that DOOSTDAR or GHORBANI would and did act in the United States as an agent of a foreign government.

zz.     At no time from in or around March 2017 through on or about August 9, 2018, did DOOSTDAR or GHORBANI apply for a license from OFAC, which is located in the District of Columbia, to export services to Iran.

(**Conspiracy,** in violation of Title 18, United States Code, Section 371)

## COUNT TWO
### (Acting As an Unregistered Agent of a Foreign Government)

25.     The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Sixteen of this Indictment.

26.     From in or around March 2017, up to and including the August 9, 2018, in the District of Columbia, Iran, and elsewhere, DOOSTDAR and GHORBANI, did knowingly act in the United States as agents of a foreign government, specifically the Government of Iran, without prior notification to the Attorney General, as required by law, in violation of Title 18, United States Code, Section 951.

(**Agents of Foreign Governments,** in violation of Title 18, United States Code, Section 951)

## COUNT THREE
### (International Emergency Economic Powers Act)

27.     The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Sixteen of this Indictment.

28.     In or around July 2017, within the District of Columbia, Iran, and elsewhere, DOOSTDAR, a United States Person, did unlawfully, knowingly, and willfully commit an offense against the United States, to wit, a violation of Title 50, United States Code, Sections 1701-1706 and the Iranian Transactions and Sanctions Regulations, by providing services to Iran, by collecting targeting information about two Jewish centers at the University of Chicago, without having first obtained the required license from the Office of Foreign Assets Control.

**(IEEPA,** in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Parts 560.204, 560.206)

## COUNT FOUR
### (International Emergency Economic Powers Act)

29.     The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Sixteen of this Indictment.

30.     In or around September 2017, within the District of Columbia, Iran, and elsewhere, DOOSTDAR and GHORBANI, United States Persons, did unlawfully, knowingly, and willfully commit an offense against the United States, to wit, a violation of Title 50, United States Code, Sections 1701-1706 and the ITSR, by providing services to Iran, by collecting targeting information about the People's Mujahedin of Iran, or Mojahedin-e Khàlq at a rally in New York, New York, without having first obtained the required license from the Office of Foreign Assets Control.

(**IEEPA**, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Parts 560.204, 560.206)

## COUNT FIVE
### (International Emergency Economic Powers Act)

31.     The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Sixteen of this Indictment.

32.     In or around December 2017, within the District of Columbia, Iran, and elsewhere, DOOSTDAR and GHORBANI, United States Persons, did unlawfully, knowingly, and willfully commit an offense against the United States, to wit, a violation of Title 50, United States Code, Sections 1701-1706 and the Iranian Transactions and Sanctions Regulations, by providing services to Iran, by packaging and providing targeting information about the People's Mujahedin of Iran, or Mojahedin-e Khalq, without having first obtained the required license from the Office of Foreign Assets Control.

(IEEPA, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Parts 560.204, 560.206)

## COUNT SIX
### (International Emergency Economic Powers Act)

33.     The grand jury realleges and incorporates by reference the allegations set forth in Paragraphs One through Sixteen of this Indictment.

34.     In or around May 2018, within the District of Columbia, Iran, and elsewhere, DOOSTDAR and GHORBANI, United States Persons, did unlawfully, knowingly, and willfully commit an offense against the United States, to wit, a violation of Title 50, United States Code, Sections 1701-1706 and the Iranian Transactions and Sanctions Regulations, by providing services to Iran, by collecting targeting information about the People's Mujahedin of Iran, or Mojahedin-e Khalq at a rally in Washington, D.C., without having first obtained the required license from Office of Foreign Assets Control.

(**IEEPA,** in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Parts 560.204, 560.206)

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia